# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **TRUBRIDGE, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION NO. CV-1:25-CV-00122** |
| **TIMETREX SOFTWARE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT

Pursuant to Fed. R. Civ. P. 15(a)(1)(B), Plaintiff TruBridge, Inc. ("TruBridge") files this its First Amended Complaint.

## NATURE OF ACTION

This is an action for breach of contract, tortious interference with business and contractual relationships, false advertising in violation of § 43(a) of the United States Trademark Act of 1946, 15 U.S.C. § 1125(a), trespass to chattels, and unjust enrichment.

## PARTIES

1.      Plaintiff TruBridge, Inc. ("TruBridge") is a Delaware corporation with its principal place of business in Mobile, Alabama.

2.      TruBridge was formerly known as Computer Programs & Services, Inc. ("CPSI"). In the spring of 2024, CPSI subsidiary, TruBridge, LLC, merged into CPSI, and CPSI changed its name to TruBridge, Inc.

3.      Defendant TimeTrex Software, Inc. ("TimeTrex") is a Province of British Columbia Corporation with its principal place of business in West Kelowna, British Columbia, Canada.

## JURISDICTION AND VENUE

4.    This Court has subject-matter jurisdiction over this claim under 28 U.S.C.

§ 1332(b) because, as set forth below, the amount in controversy exceeds $75,000, exclusive of

interest and costs, and the controversy is between a citizen of a state (Delaware or Alabama) and

a citizen of a foreign country (Canada).

5.    This Court has personal jurisdiction over TimeTrex because TimeTrex consented

to the exercise of personal jurisdiction by this Court for any action brought to enforce or interpret

the Master Agreement at issue in this civil action.

6.    Venue is proper because TruBridge and TimeTrex consented to venue in this

judicial district for all actions brought to enforce or interpret the Master Agreement at issue in this

civil action.

## FACTUAL BACKGROUND

### TruBridge

7.    TruBridge provides an electronic health record system ("EHR"), software, business

management, consulting, management technology services and other goods and services to rural

and community healthcare organizations ("hospitals").

8.    As it concerns its EHR services, TruBridge offers hospitals a robust and

sophisticated system that includes a number of software solutions from patient registration to

patient care to revenue cycle to back-office solutions. In some respects, the EHR is an enterprise

resource product.

9.    In some instances, the software solutions are offered as a bundle of services, some

of which include third-party software.

**TimeTrex Agreement**

10. One bundle of services offered by TruBridge, 3R Management, includes a human resources and payroll solution.

11. Since approximately 2019, pursuant to the terms and conditions of the December 15, 2019 TimeTrex Master Agreement (the "Agreement"), TruBridge has utilized TimeTrex as a provider of a portion of its human resources and payroll solution.

12. The term of the Agreement between TruBridge and TimeTrex was five years. *See* Doc. 1-1 at Page ID #19.

13. Under the Agreement, TruBridge was permitted to sublicense the TimeTrex human resources and payroll solution to EHR customers who selected 3R Management ("EHR/3R customers").

14. In return, TruBridge was required to pay TimeTrex a license fee.

15. In practical terms, TruBridge handled the full implementation of the solution for its EHR/3R customers, including the planning, system configuration, and profile set-up necessary to connect TruBridge's EHR/3R customers with the human resources and payroll solution. TruBridge also provided access to the solution through hosting in a secure Google Cloud environment and provided all direct, customer-facing support for the solution.

16. As part of the planning, configuring, and setting up, TruBridge submitted Statements of Work to TimeTrex to enhance existing tables for scheduling, pay shift differentials, and timekeeping for its EHR/3R customers (the "Configuration Tables") to meet their specific business needs. These tables were "Deliverables" under the parties' Agreement.

**TruBridge Performance (2019 to 2023)**

17.    TruBridge fully performed under the Agreement including by pre-paying Timetrex annual license fees for a certain number of licenses that increased year to year up to 237,000 licenses by year 5 of the Agreement. In 2020, TruBridge paid TimeTrex $3,000. In 2021, TruBridge paid TimeTrex $968,012.42. In 2022, TruBridge paid TimeTrex $1,118,157.56. In 2023, TruBridge paid TimeTrex $1,338,887.27.

18.    TruBridge's payments to TimeTrex were based on hospitals using a certain number of licenses per year.[1] By year 5 of the Agreement, it was expected that TruBridge's EHR/3R customers would be entering 237,000 employees into the human resources and payroll solution. But upon information and belief, from 2019 to 2024, only about 32,200 employees were entered into the solution.

**Termination of the Agreement**

19.    In late 2023, as the end of the initial five-year term was approaching, TruBridge and Timetrex began discussions about renewing the Agreement.

20.    In early 2024, Mike Benoit, President of TimeTrex, told Jeremiah Rothschild, Senior Vice President and Chief Strategist for TruBridge, that TimeTrex was not interested in continuing its current relationship with TruBridge. Instead, TimeTrex wanted to provide a managed service option and was discontinuing the self-service offering provided to TruBridge's EHR/3R customers.  More specifically, TimeTrex wanted TruBridge to turn over its EHR/3R customers to TimeTrex (and to charge those customers at substantially higher rates). A few months later, by letter dated May 16, 2024, TimeTrex terminated the Agreement, pursuant to Section 8.1 of the Agreement. The termination was to be effective on December 12, 2024. *See* Doc.1-1, § 8.1

---

[1]In essence, the license fee was calculated based on the number of employees TruBridge's EHR/3R customers entered into the human resources and payroll solution.

(Page ID #19–20); Doc. 1-2.   Among other things, TimeTrex's termination letter stated that TimeTrex was terminating its relationship with TruBridge "after deep reflection and strategic considerations related to [its] company's future direction and product roadmap." Doc. 1-2. Importantly, pursuant to section 8.5 of the Agreement, TimeTrex offered to continue providing services for two additional years. *Id.*

21.      Despite the termination letter, TruBridge was still interested in renewing its relationship with TimeTrex primarily to ensure continuity of services for its EHR/3R customers' operations. By July 2024, however, it became clear that renewal was not possible.   More particularly, believing it had the upper negotiating hand because TruBridge's EHR/3R customers had grown accustomed to its human resources and payroll solution that was embedded as a function of TruBridge's offering, TimeTrex made a number of unreasonable and unacceptable demands to TruBridge.  Specifically, in a July 11, 2024 email, TimeTrex demanded that:

a.  TimeTrex "assume responsibility for all implementation, support, and US-based hosting of all TruBridge TimeTrex customers";

b.  TruBridge pay TimeTrex a "newly agreed-upon license fee";

c.  TruBridge pay TimeTrex at a rate of $6.05/employee and $10/tablet per month "[s]ubject to annual CPI increases" for any "legacy customers";

d.  TruBridge "maintain existing product integrations with TimeTrex at its own expense;

e.  TruBridge "refer all existing and potential new customers to TimeTrex" for services;

f.  TruBridge allow TimeTrex to give employment offers to TruBridge employees who had been working on TimeTrex.

*See* Exhibit 1.

22.    During negotiations with TimeTrex, TruBridge began searching for a new human resources and payroll provider as it was clear that the relationship was deteriorating.  In or around November 2024, after negotiations with TimeTrex failed, TruBridge selected a new provider.

23.    However, to ensure its EHR/3R customers' continued access to a human resources and payroll solution during the estimated nine-month transition from TimeTrex to the new provider, on or around December 13, 2024, and pursuant to section 8.5 of the Agreement, TruBridge paid TimeTrex $1,264,874.80 for one additional year of services—from December 12, 2024 to December 12, 2025 (the "tail period").[2]

24.    TimeTrex accepted TruBridge's payment and thus bound itself to the terms and conditions of the Agreement during the tail period.

**TimeTrex Breaches**

25.    Following the end of the initial term of the Agreement but during the tail period, TimeTrex has breached and continues to breach it obligations to TruBridge under the Agreement.

26.    In January 2025, TruBridge informed its EHR/3R customers that it would be moving to the new, full-service human resources and payroll provider.

27.    Shortly after TruBridge's customer announcement, TimeTrex began directly marketing its goods and services to TruBridge's EHR and EHR/3R customers.

28.    Initially, TimeTrex's marketing attempts were subtle but misleading. For example, TimeTrex told TruBridge's customers TimeTrex would continue to support hospitals outside of TruBridge's offerings, the termination of the relationship between TimeTrex and TruBridge would

---

[2] Pursuant to § 8.5 of the Agreement, TruBridge has the option to pay TimeTrex for another year of services. Doc. 1-1, § 8.5 (Page ID #20).

not impact their TimeTrex experience in any way, and they could continue to use the TimeTrex product as well as TimeTrex's support of the product.

29.    As a result of TimeTrex's statements, counsel for TruBridge sent a cease-and-desist letter to TimeTrex on January 30, 2025, demanding that TimeTrex "immediately stop, and instruct its employees and representatives to stop, employing such deceptive and defamatory sales tactics and immediately cease and desist from any further and wrongful deceptive communications regarding TruBridge and CPSI." Doc. 1-3 at Page ID #51.

30.    TimeTrex failed to comply with TruBridge's cease-and-desist demand.

31.    Indeed, TimeTrex became more aggressive and less subtle and began directly asking customers to enter into agreements directly with TimeTrex.  For example, on March 13, 2025, at 3:36 p.m., TimeTrex contacted a TruBridge EHR/3R customer and asked the customer to sign an agreement with TimeTrex.  TimeTrex also told the customer that it was no longer prohibited from entering into an agreement with the customer, which was and continues to be categorically false.

32.    Since then, TimeTrex has entered into agreements with TruBridge's EHR/3R customers, is negotiating agreements with others, and is sending proposals to still others.

33.    TimeTrex continues to directly market the human resources and payroll solution to TruBridge's EHR/3R customers.

34.    Under the Agreement, TimeTrex granted TruBridge the exclusive right to license (or sublicense) the human resources and payroll solution to its EHR customers during the initial term of the Agreement and for any tail periods thereafter. *See* Doc. 1-1, §§ 3.9 (Page ID #15−16),

8.5, 8.6 (Page ID #20).[3] TimeTrex's actions identified in paragraphs 27 through 33 all represent a breach of this provision of the Agreement.

35.    The terms and conditions of the Agreement constitute "Confidential Information" under the Agreement and Agreement prohibits the disclosure of "Confidential Information." *See* Doc.1-1, § 4.1 (Page ID #16). TimeTrex has shared the terms and conditions of the Agreement with TruBridge's EHR/3R customers.

36.    On March 24, 2025, TruBridge discovered that a TruBridge customer created a TimeTrex support login effectively deleting TruBridge's permission group. The TimeTrex support login accessed TruBridge's customer account on March 24, at 4:19 p.m., from West Kelowna, BC, Canada. The use of this login by TimeTrex is a violation of the "Support and Maintenance Rider" of the Agreement, in particular, that "Support Services are provided to [TruBridge] directly and are not provided to [TruBridge's] customers or end-users" and "TimeTrex does not provide Support of any kind for [TruBridge's] end-users." *See* Doc. 1-1, Ex. C, §§ 2.3, 3.4 (Page ID #35).

37.    On May 13, 2025, TimeTrex forced an automatic and unauthorized update on the human resources and payroll solution and pushed a "pop-up" message through the human resources and payroll solution to remind TruBridge's EHR/3R customers about the "Rapid Migrate" service and telling customers that TimeTrex was "waiving all migration fees until June 30th" and providing contact information for customers if they had "any questions or would like to get started." *See* Exhibit 2. This unauthorized update violated the Support and Maintenance Rider of the Agreement. TruBridge's EHR/3R customers continue to see notices related to the "Rapid Migrate" service every time they log into the system.

---

[3] The Agreement grants TruBridge "exclusive licensing rights for hospitals, clinics, and skilled nursing facilities that have purchased [TruBridge's] EHR solution." *See* Doc. 1-1, § 3.9 (Page ID #15–16).

38.     As a direct and proximate result of TimeTrex's breaches, TruBridge has lost and continues to lose revenue.  Further, TruBridge pre-paid TimeTrex for access to and support for the human resources and payroll solution for customers during the tail period—customers that TimeTrex is now attempting to convert to its own. Finally, TruBridge has suffered a loss of reputation in the market and in the eyes of its customers.

**TimeTrex's Tortious Interference**

39.     As set forth above, TruBridge provides, among other things, an EHR to hospitals and does so pursuant to multi-year service agreements executed by TruBridge and the hospitals. In those agreements, the hospital selects the software solutions suitable for their organization and TruBridge charges the hospital a service fee based on the selected suite of products.

40.     From the time TruBridge and TimeTrex entered into the Agreement until today, TruBridge had entered into agreements with approximately 148 hospitals to provide EHR services including access to a human resources and payroll application.

41.     At the time of entering into the Agreement and until today, while the number of hospitals with which it has such relationships may have changed, TimeTrex was and is undisputedly aware of TruBridge's agreements with its EHR/3R customers.  TimeTrex was not a party to the agreements, TimeTrex had no beneficial interest or economic interest in TruBridge's agreements with its EHR/3R customers, and TimeTrex did not have any control over the relationships between TruBridge and its EHR/3R customers.  While a human resources and payroll application was a part of TruBridge's agreements with its EHR/3R customers, TimeTrex was not 3R Management and 3R Management was not TimeTrex.  Moreover, TimeTrex was not essential to TruBridge's agreements with its EHR/3R customers and was not referenced in those agreements. Indeed, TruBridge has provided its EHR customers access to its own human resources

and payroll solution and is providing its EHR/3R customers access to human resources and payroll solutions of itself and others. Thus, in all respects, TimeTrex was and is a stranger to the agreements.

42.    As set forth in paragraphs 27–28, 31–33, and 36–37 above, and paragraphs 43, 45, and 46 below, TimeTrex intentionally interfered with TruBridge's relationships by, among many things:

a.  Communicating with TruBridge's EHR/3R customers about its goods and services in violation of the Agreement, including by using TruBridge's customer lists that were contained in the 3R product, which TimeTrex was unauthorized to access or leverage;

b.  Providing false and misleading information to TruBridge's EHR/3R customers;

c.  Soliciting TruBridge's EHR/3R customers in violation of the Agreement;

d.  Submitting proposals to TruBridge's EHR/3R customers in violation of the Agreement;

e.  Contracting with TruBridge's EHR/3R customers in violation of the Agreement;

f.  Utilizing the December 12, 2024, payment by TruBridge to offer TruBridge's EHR and EHR/3R customers free services or services at a steep discount during the tail period but with designs to increase services fees once the tail period expires. Stated another way, TimeTrex has used and is using TruBridge's funds in a classic bait-and-switch scheme;

g.  Sending a message through the human resources and payroll solution that appeared                to                be                associated                with                TruBridge,

10

DoNotReply@app04.3rmanagement.cpsi.com, and using the notification functionality that would normally be used to send TruBridge's EHR/3R customers communications about downtime, outages, etc. related to the human resources and payroll solution. The message was sent to approximately 600 TruBridge customer contacts and 144 unique TruBridge EHR/3R customers with the subject line, "Important TimeTrex Clarification." The message said that "[a]lthough our partnership with [TruBridge] has concluded, TimeTrex remains fully committed to serving all existing markets, ensuring uninterrupted access to the comprehensive services you rely on." The message also introduced TimeTrex's "Rapid Migrate service, specifically designed to streamline migrations between any two TimeTrex deployments." The message said that TimeTrex could "typically complete [migrations] within just one evening" and that it would be "waiving all migration fees until May 31st."[4] Setting aside the fact TimeTrex was and is contractually prohibited from entering into agreements with TruBridge's EHR customers, the statement includes false and misleading information. For example, TimeTrex could not migrate customers in one evening without utilizing the Configuration Tables TruBridge owns under the Agreement.

h.  Pushing a "pop-up" message through the human resources and payroll solution to remind TruBridge EHR/3R customers about the "Rapid Migrate" service and telling customers that TimeTrex was "waiving all migration fees until June

---

[4]The message also included a link that allowed TruBridge customers to elect to migrate their data. Since this action was filed, the link has been removed.

30th" and providing contact information for customers if they had "any questions or would like to get started."

i.   Upon information and belief, TimeTrex has also accessed TruBridge environments using logins that do not comply with the agreed-upon security requirements.

j.   Upon information and belief, TimeTrex has accessed TruBridge's EHR/3R customers' data and TruBridge's contact lists without TruBridge's permission.

k.   Upon information and belief, TimeTrex forced an automatic update not authorized by TruBridge on TruBridge's EHR/3R customers to assist with their ability to migrate customer data. This automatic update caused systems errors for TruBridge's customers that temporarily prevented customers from submitting bills to their payers.

43.   TimeTrex's motive for this conduct could not be more clear.  As set forth above, in 2024, as part of negotiations regarding renewing the Agreement, TimeTrex demanded that TruBridge transfer all of its EHR/3R customers to TimeTrex.  When it determined that TimeTrex's demands were unreasonable and it realized the Agreement would not be renewed, TruBridge was forced to identify and contract with a new human resources and payroll vendor. Once it learned TruBridge had contracted with a new vendor, TimeTrex realized that it would lose over a million dollars in annual revenues, much of which is unearned revenue. Thus, despite accepting over a million dollars from TruBridge for continued services in 2025 and despite its continuing obligations to TruBridge under the Agreement, TimeTrex began a campaign to illicitly coerce TruBridge's EHR and EHR/3R to use or continue to use its human resources and payroll solution and ultimately to sign agreements with TimeTrex.  That is, TimeTrex's misconduct was a patent

and prohibited attempt to compete with TruBridge for TruBridge's EHR and EHR/3R customers in direct violation of the Agreement.

44.  As a direct and proximate result of TimeTrex's breaches, TruBridge has lost and continues to lose revenue.  Further, TruBridge pre-paid TimeTrex for access to and support for the human resources and payroll solution for customers during the tail period—customers that TimeTrex is now attempting to convert to its own. Moreover, TruBridge has figuratively and literally lost the amount it pre-paid TimeTrex for services under the tail period.  Finally, TruBridge has suffered a loss of reputation in the market and in the eyes of its customers and has lost good will with its customers because of TimeTrex's confusing messages to TruBridge's customers.

**TimeTrex's False and Misleading Advertising**

45.    TimeTrex has made a number of literally, objectively, and demonstrably false statements to TruBridge EHR/3R customers including but not limited to stating that:

a.  TruBridge was responsible for ending the partnership with TimeTrex when it was TimeTrex that terminated the Agreement;

b.  TruBridge prohibited its EHR/3R customers from entering into agreements with TimeTrex when, in fact, TimeTrex agreed TruBridge was the exclusive reseller of TimeTrex's human resources and payroll solution to TruBridge's EHR and EHR/3R customers;

c.  TimeTrex is permitted to contract with TruBridge's EHR and EHR/3R customers when, in fact, TimeTrex agreed TruBridge was the exclusive reseller of TimeTrex's human resources and payroll solution to TruBridge's EHR and EHR/3R customers;

d. TimeTrex held itself out as TruBridge to TruBridge's EHR and EHR/3R customers by sending them a message through the human resources and payroll solution that included a cpsi.com url and using the notification functionality typically normally used to send TruBridge's EHR and EHR/3R customers messages about TimeTrex's goods and services and in solicitation of its businesses.

e. TimeTrex told TruBridge customers that it could "rapid[ly] migrate" customers from 3R to TimeTrex. In order to do so, however, TimeTrex had to make unauthorized changes in the back-end of the product that is hosted within a secure TruBridge-hosted environment and use the Configuration Tables.

46.     TimeTrex has assured clients that they will have the same experience with TimeTrex for their payroll processing as they have had with TruBridge.  In reality, because TruBridge interfaces with its own EHR's proprietary accounting systems for 3R Management, it is impossible for TimeTrex to offer the same experience unless they move information from 3R Management to TimeTrex through use of a new interface and/or bots between systems.

47.     These false and misleading statements were made in connection with a commercial advertisement or promotion and more particularly in conjunction with TimeTrex's attempt to induce TruBridge's EHR/3R customers to enter contracts with TimeTrex.

48.     These false and misleading statements deceived, intended to deceive, and continue to deceive a substantial number of TruBridge's EHR and EHR/3R customers, many of which do not understand that essential data, interfaces, and functionalities would not be available with TimeTrex.

49.     These false and misleading statements have influenced and are continuing to influence TruBridge's EHR and EHR/3R customers' decisions regarding the selection of a human resources and payroll software solution.

50.     The goods and services at issue in this matter are transported in interstate commerce.

51.     As a direct and proximate result of TimeTrex's breaches and false statements, TruBridge has lost and continues to lose revenue.  Further, TruBridge pre-paid TimeTrex for access to and support for the human resources and payroll solution for customers during the tail period—customers that TimeTrex is now attempting to convert to its own. Finally, TruBridge has suffered a loss of reputation in the market and in the eyes of its customers and has had to allocate resources in response to customer concerns.

**TimeTrex's Trespass to TruBridge's Chattels**

52.     As set forth in paragraph 37 above, TimeTrex forced an automatic and unauthorized update to the human resources and payroll solution.

53.     Upon information and belief, TimeTrex pushed this update to make changes to TruBridge's EHR and in order to facilitate "rapid migration" of data. It also added an unauthorized pop-up box containing text urging EHR/3R customers to migrate to Timetrex's competing product, which opens each and every time EHR/3R customers log into the 3R system.

54.     The unauthorized update led to client disruption with integrations and impaired hospitals' use of the EHR and the human resources and payroll solution.

**COUNT I**
**BREACH OF CONTRACT**

55.     TruBridge incorporates by reference Paragraphs 7-54 as though fully set forth herein.

56.     TruBridge has an executed Agreement with TimeTrex.

57.     At all times relevant, TruBridge has performed its obligations under the Agreement and stands ready willing and able to continue to perform those obligations as they relate to the tail period.

58.     The Agreement contains an exclusivity provision. *See* Doc. 1-1, § 3.9 (Page ID #15−16). As set forth above, TimeTrex has breached and continues to breach the exclusivity provision of the Agreement.

59.     The Agreement contains a confidentiality provision. *See* Doc. 1-1, § 4.1 (Page ID #16). As set forth above, TimeTrex has breached and continues to breach the confidentiality provision.

60.     The Agreement contains a "Support and Maintenance Rider." As set forth above, TimeTrex has breached and continues to breach the "Support and Maintenance Rider." *See* Doc. 1-1, Ex. C, §§ 2.3, 3.4 (Page ID #34−37).

61.     TruBridge was damaged by and continues to be damaged by TimeTrex's actions.

**COUNT II**
**TORTIOUS INTERFERENCE WITH**
**CONTRACTUAL AND/OR BUSINESS RELATIONSHIPS**

62.     TruBridge incorporates by reference Paragraphs 7-61 as though fully set forth herein.

63.     TruBridge has ongoing contractual and/or business relationships with healthcare hospitals across the nation. As a part of these ongoing contractual and/or business relationships, TruBridge provides hospitals access to a human resources and payroll software solution.

64.    TimeTrex knew or had reason to know of TruBridge's contractual and/or business relationships with approximately 148 hospitals because TimeTrex permitted TruBridge to sublicense its human resources and payroll software to those customers.

65.    As set forth above, TimeTrex was and is a stranger to the relationships between TruBridge and those customers.

66.    TimeTrex, without justification or privilege, has intentionally interfered with and continues to interfere with the business and/or contractual relationships as set forth above.

67.    TimeTrex's actions are wrongful and actionable because they are a direct attempt to injure TruBridge's business and build TimeTrex's own business at TruBridge's expense.

68.    TimeTrex's unjustifiable actions have actually and proximately caused significant injury to TruBridge.

69.    TruBridge was damaged by and continues to be damaged by TimeTrex's actions.

## COUNT III
## FALSE AND MISLEADING ADVERTISING UNDER THE LANHAM ACT

70.    TruBridge incorporates by reference Paragraphs 7-69 as though fully set forth herein.

71.    As set forth above, TimeTrex—which is in commercial competition with TruBridge—made false and misleading statements about its own product and about TruBridge's product and services in promotions to TruBridge's EHR and EHR/3R customers.

72.    TimeTrex's false and misleading statements have deceived a substantial segment of TruBridge's EHR and EHR/3R customers and/or have the tendency to deceive them.

73.    The deception was material and has influenced and is likely to continue influencing TruBridge's EHR and EHR/3R customers' purchasing decisions.

74.    TimeTrex's false and misleading statements concern goods and services in

interstate commerce.

75.    TimeTrex's conduct constitutes false advertising in violation of § 43(a) of the United States Trademark Act of 1946, 15 U.S.C. § 1125(a).

76.    TruBridge has been and continues to be injured because of the false and misleading statements as TruBridge's EHR and EHR/3R customers have executed services agreements with TimeTrex and have migrated their data to TimeTrex both resulting in loss of revenues. Additionally, TruBridge has lost goodwill and/suffered reputational harm with its EHR customers, its EHR/3R customers, and generally the market.

## COUNT IV
## TRESPASS TO CHATTELS

77.    TruBridge incorporates by reference Paragraphs 7-76 as though fully set forth herein.

78.    TimeTrex accessed TruBridge's EHR, which is hosted in TruBridge's Google Cloud environment, to make changes in the backend of the software code to send unsolicited and unapproved advertising messages to TruBridge's customers and force an automatic update. In doing so, TimeTrex intentionally used and/or intermeddled with TruBridge's chattel.

79.    The unauthorized update and advertising messages led to client disruption with integrations and impaired hospitals' use of the EHR and human resources and payroll solution.

## COUNT V
## UNJUST ENRICHMENT

80.    TruBridge incorporates by reference Paragraphs 7-79 as though fully set forth herein.

81.    From 2020 to 2023, TruBridge annually pre-paid TimeTrex amounts ranging from $3,000 up to $1,338,886.27 for licenses.

82.    Even though it paid for 237,000 licenses in December 2023 for 2024, TruBridge used only 32,200 licenses in 2024.

83.    After TimeTrex's non-renewal of the Agreement, TruBridge paid TimeTrex $1,264,874.80 for continued services.

84.    Despite this payment, for customers who migrate to TimeTrex, TimeTrex is either (a) charging a fee per customer, causing the customer to pay twice (to both TruBridge under its EHR services agreement and to TimeTrex under the customer's stand-alone agreement with it) and allowing TimeTrex to double dip on licenses or (b) waiving customer fees because it is already being paid for the licensing fees by TruBridge.

85.    Additionally, TimeTrex is using Configuration Tables TruBridge owns to "rapid[ly] migrate" TruBridge EHR/3R customers over to TimeTrex without paying TruBridge for their use.

86.    TimeTrex is holding or has held money which, in equity and good conscience and under law, belongs to TruBridge.

87.    TimeTrex has unjustly enriched itself by being paid for 237,000 license fees while TruBridge used only a fraction of those licensing fees.

88.    TimeTrex has unjustly enriched itself by double dipping and/or waiving customer fees because TruBridge has already paid them.

89.    TimeTrex has unjustly enriched itself by using Configuration Tables TruBridge owns to its benefit and at the expense of TruBridge.

90.    All monies for the post-termination support and a fraction of the monies paid from 2020 to 2024 are due to be repaid to and for the benefit of TruBridge.

91.    TruBridge seeks restitution from TimeTrex in an amount to be determined by the

trier of fact and all other relief at law and equity to which it may be entitled.

## **PRAYERS FOR RELIEF**

WHEREFORE, TruBridge, Inc., respectfully requests the Court enter judgment against TimeTrex and award TruBridge all of its damages caused by TimeTrex including, but not limited to:

a.      Compensatory damages;

b.      Punitive damages;

c.      Disgorgement of profits;

d.      Restitution;

e.      Interest;

f.      Reasonable costs;

g.      Permanent injunctive relief;

h.      Corrective advertising;

i.      Attorneys' fees;

j.      Restitution;

k.      Such other equitable and legal relief as is just and proper under the circumstances.

Respectfully submitted this 5th day of June, 2025.

> _/s/ Walton Jackson_
> J. Walton Jackson
> Madison Peace Nye
> _Attorneys for Plaintiff TruBridge, Inc._

**OF COUNSEL:**

MAYNARD NEXSEN
RSA Battle House Tower
11 N. Water Street, Suite 24290
Mobile, Alabama 36602
T: (251) 432-0001
F: (251) 432-0007
wjackson@maynardnexsen.com
mnye@maynardnexsen.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been provided electronically to all parties via ECF on this 5th day of June, 2025.

*/s/ J. Walton Jackson*
OF COUNSEL