**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **TRUBRIDGE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACT. NO. 1:25-cv-122-TFM-MU** |
| | ) | |
| **TIMETREX SOFTWARE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

# ORDER

Pending before the Court is *TimeTrex's Motion for Partial Judgment on the Pleadings* (Doc. 39, filed September 25, 2025) in which Defendant TimeTrex Software, Inc., motions for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), as to Count 1 (breach of contract) and Count 4 (trespass to chattels) of Plaintiff TruBridge, Inc.'s, First Amended Complaint because it failed to allege a breach of any terms of the Master Agreement and any harm to its computing resources, respectively. Having considered the motion (*id.*), response (Doc. 42), reply (Doc. 43), and relevant law, the Court finds the motion is due to be **DENIED**.

## I. JURISDICTION AND VENUE

The Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332 (diversity).

The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. The district court has personal jurisdiction over the claims in this action, and venue is proper, based on a forum-selection clause, which is contained in the contract that is the basis of this action. *See Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1330-32 (11th Cir. 2011) (discussing the limit of the scope and enforceability of a forum-selection clause).

## II. BACKGROUND

### A. Factual Background[1]

Plaintiff provides electronic health record ("EHR") software, business management, consulting, management technology services, and other good and service to rural and community health care organizations. Doc. 14 at 2. Plaintiff TruBridge, Inc. ("Plaintiff" or "TruBridge"), offers hospitals many software offerings that address issues such as patient registration, patient care, revenue cycles, and back-office tasks. *Id.* Some of TruBridge's software solutions are offered as a bundle of services, some of which include third-party software. *Id.* One bundle of services that is offered by TruBridge, 3R Management, includes a human resources and payroll solution. *Id.* at 3.

On December 15, 2019, TruBridge and Defendant TimeTrex Software, Inc. ("Defendant" or "TimeTrex"), executed a Master Agreement ("the Agreement"), the term of which was five (5) years, and since then, TimeTrex provided TruBridge a portion of its human resources and payroll solution. *Id.* Pursuant to the Agreement, TruBridge was permitted to sublicense the TimeTrex human resources and payroll solution to EHR customers who selected 3R Management ("HER/3R customers"), and in return, TruBridge was required to pay TimeTrex a license fee. *Id.*

TruBridge handled the implementations of a solutions for its EHR/3R customers, including the planning, system configuration, and profile set-up necessary to connect the customer with the

[1] For a motion for judgment on the pleadings, the Court must "accept as true all material facts alleged in the non-moving party's pleadings," which are viewed in "the light most favorable to the non-moving party." *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014) (citing *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998)). "[W]hen resolving a motion to dismiss or a motion for judgment on the pleadings, a court may properly consider a document not referred to or attached to a complaint under the incorporation-by-reference doctrine if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F. 4th 1292, 1300 (11th Cir. 2024) (footnote omitted).

human resources and payroll solution, provided access to the solution through hosting in a secure Google Cloud environment, and provided customer support for the solution. *Id.* To plan, configure, and set up a solution for an EHR/3R customer, TruBridge submitted Statements of Work to TimeTrex to enhance tables for scheduling, pay shift differentials, and timekeeping. *Id.* Under the Agreement, the tables were considered "Deliverables." *Id.*

In late 2023, when the conclusion of the initial five-year terms of the Agreement approached, TruBridge and TimeTrex discussed renewing the Agreement. *Id.* at 4. In early 2024, the president of TimeTrex, Mike Benoit, told the senior vice president and chief strategist for TruBridge, Jeremiah Rothschild, TimeTrex did not want to continue its relationship with TruBridge. *Id.* Instead, TimeTrex wanted to provide a managed service option, thereby discontinuing the self-service offering that was provided to TruBridge's EHR/3R customers. *Id.* Effectively, TimeTrex wanted TruBridge to turn over its customers to TimeTrex. *Id.* at 4.

On May 16, 2024, TimeTrex, via a letter that was dated May 15, 2024, terminated the Agreement, pursuant to Section 8.1 thereof, with an effective termination date of December 12, 2024. *Id.* at 4. In the termination letter, TimeTrex stated it was terminating its relationship with TruBridge "after deep reflection and strategic considerations related to [its] company's future direction and product roadmap," but offered to continue to provide services for two (2) additional years, pursuant to § 8.5 of the Agreement. *Id.*; *see* Doc. 1-2.

Despite the termination letter, TruBridge was interested in renewing its relationship with TimeTrex to ensure continuity of services for its EHR/3R customer, but by July 2024, it became clear to TruBridge that renewal was not possible, based on TimeTrex's demands to do so, which were stated in a July 11, 2024 email. Doc. 14 at 5. TimeTrex demanded "[it] 'assume responsibility for all implementation, support and US-based hosting of all TruBridge TimeTrex

customers,'" "TruBridge pay TimeTrex a 'newly agreed-upon license fee,'" "TruBridge pay TimeTrex at a rate of $6.05/employee and $10/tablet per month 'subject to annual CPI increases' for any 'legacy customers,'" "TruBridge 'maintain existing product integrations with TimeTrex at its own expense," "TruBridge 'refer all existing and potential new customers to TimeTrex' for services," and "TruBridge allow TimeTrex to give employment offers to TruBridge employees who had been working on TimeTrex." *Id.*

While TruBridge negotiated with TimeTrex, it searched for a new human resources and payroll provider, and in November 2024, after negotiations with TimeTrex failed, TruBridge selected a new provider of such services. *Id.* at 6. There would be an estimated nine-month transition from TimeTrex to the new human resources and payroll provider, so on December 13, 2024, and pursuant to section 8.5 of the Agreement, TruBridge paid TimeTrex $1,264,874.80 for one additional year of services, which would last from December 12, 2024, to December 12, 2025 ("the tail period"). *Id.* TimeTrex accepted TruBridge's payment for the tail period. *Id.*

In January 2025, TruBridge informed its EHR/3R customers it would move to the new human resources and payroll provider. *Id.* TimeTrex then began to market its goods and services to TruBridge's EHR and EHR/3R customers and communicated to them TimeTrex would continue to support hospitals outside of TruBridge's offerings, the terminations of the relationship between TimeTrex and TruBridge would not impact their TimeTrex experience, and they could continue to use the TimeTrex product as well as TimeTrex's support of the product. *Id.* at 6-7.

On January 30, 2025, counsel for TruBridge sent a cease-and-desist letter to TimeTrex in which it demanded TimeTrex "immediately stop, and instruct its employees and representatives to stop[ ] employing such deceptive and defamatory sales tactics and immediately cease and desist

from any further and wrongful deceptive communications regarding TruBridge and CPSI[2]." *Id.* at 7 (quoting Doc. 1-3 at 4).

On March 13, 2025, at 3:36 p.m., TimeTrex contacted a TruBridge EHR/3R customer and asked the customer to sign an agreement with TimeTrex and told the customer it was no longer prohibited to enter into such an agreement. *Id.* Since then, TimeTrex has entered into agreements with TruBridge's EHR/3R customers, is negotiating with, and sending proposals to, other customers, and is directly marketing the human resources and payroll solution to TruBridge's EHR/3R customers. *Id.*

Pursuant to the Agreement, TimeTrex granted TruBridge the exclusive right to license (or sublicense) the human resources and payroll solution to its EHR customers during the initial term, and subsequent tail periods, of the Agreement. *Id.*; *see* Doc. 1-1 at 4-5, 9.

Further, the terms and conditions of the Agreement constitute "Confidential Information," according to the Agreement, and it prohibits the disclosure of "Confidential Information. Doc. 14 at 8; *see* Doc. 1-1 at 5.

On March 24, 2025, TruBridge discovered one its customers created a TimeTrex support login, which effectively deleted TruBridge's permission group. *Id.* at 8. Specifically, a TimeTrex support login accessed TruBridge's customer account at 4:19 p.m. from West Kelowna, British Columbia, Canada. *Id.* Pursuant to the "Support and Maintenance Rider" of the Agreement, "Support Services are provided to [TruBridge] directly and are not provided to [TruBridge's customers or end-users" and "TimeTrex does not provide Support of any kind for [TruBridge's] end-users." *Id.*; Doc. 1-1 at 24.

---

[2] "TruBridge was formerly known as Computer Programs & Services, Inc. ("CPSI"). In the spring of 2024, CPSI subsidiary, TruBridge, LLC, merged into CPSI, and CPSI changed its name to TruBridge, Inc." Doc. 14 at 1.

On May 13, 2025, TimeTrex sent an unauthorized update to the human resources and payroll solution that generated a "pop-up" message in the solution that reminded TruBridge's EHR/3R customers about the "Rapid Migrate" service, informed customers TimeTrex was "waiving all migration fees until June 30th," and provided contact information for customers if they had "any questions or would like to get started." Doc. 14 at 8; Doc. 14-2. TruBridge's EHR/3R customers continue to receive notices about the "Rapid Migrate" service when they log into the solution. *Id.* at 8.

**B. Procedural Background**

Plaintiff originally filed its Verified Complaint (Doc. 1) with this Court on March 28, 2025, in which it sought a temporary restraining order ("TRO") against Defendant and filed a separate motion for TRO on the same date (Doc. 2). The Court ordered Defendant to file a response to the motion for TRO and set the matter for hearing. Doc. 5. Ultimately, having considered the motion for TRO (Doc. 2), response (Doc. 8), and arguments that were presented at the motion hearing, the Court denied the motion because Plaintiff did not show it would be irreparably harmed by Defendant's alleged conduct (Doc. 11).

On May 16, 2025, Defendant filed its answer to the complaint and asserted counterclaims against Plaintiff of breach of contract (Count 1), copyright infringement (Count 2), unfair trade practices (Count 3), defamation (Count 4), unjust enrichment (Count 5), and antitrust (Count 6). Doc. 13. Plaintiff filed its answer to Defendant's counterclaims on June 6, 2025. Doc. 15.

On June 5, 2025, Plaintiff filed a first amended complaint as a matter of course in which it brought claims against Defendant of breach of contract (Count 1), tortious interference with contractual and/or business relationships (Count 2), false and misleading advertising under the Lanham Act, 15 U.S.C. § 1125(a) (Count 3), trespass to chattels (Count 4), and unjust enrichment

(Count 5). *See* FED. R. CIV. P. 15(a)(1)(B). Defendant filed its answer to Plaintiff's first amended complaint on June 20, 2025. Doc 17.

On September 25, 2025, Defendant filed its instant motion for judgment on the pleadings (Doc. 39) for which the Court entered a show cause briefing schedule (Doc. 41). Plaintiff timely filed its response to the motion (Doc. 42), and Defendant timely filed its reply (Doc. 43). The Court finds oral argument is unnecessary to resolve the motion for judgment on and the pleadings, and therefore, the motion is ripe for review.

## III. STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide that "[a]fter the pleadings are closed-but early enough not to delay trial-a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). Judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is appropriate when "no issues of material fact exist, and the movant is entitled to judgment as a matter of law." *Ortega v. Christian*, 85 F.3d 1521, 1524-25 (11th Cir. 1996). When reviewing a judgment on the pleadings, the court must accept the facts in the complaint as true and view them in the light most favorable to the nonmoving party. *Id*. A judgment on the pleadings is limited to consideration of "the substance of the pleadings and any judicially noticed facts." *Bankers Ins. Co. v. Fla. Residential Prop. & Cas. Joint Underwriting Ass'n*, 137 F.3d 1293, 1295 (11th Cir. 1998). In other words, a Fed. R. Civ. P. 12(c) motion "is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." *Doe v. Myspace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008); *see also Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999) (applying Fed. R. Civ. P. 12(b)(6) standard of review to a Fed. R. Civ. P. 12(c) motion).

Eleventh Circuit precedent discussing the standard of review for a motion under Fed. R. Civ. P. 12(c) indicates "[j]udgment on the pleadings is appropriate only when the plaintiff can

prove no set of facts in support of his claim which would entitle him to relief." *Horsley v. Feldt*, 304 F.3d 1125, 1131 (11th Cir. 2002) (quoting *Moore v. Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209, 1213 (11th Cir. 2001)); *see also Horsley v. Rivera*, 292 F.3d 695, 700 (11th Cir. 2002) ("If upon reviewing the pleadings it is clear that the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations, the court should dismiss the complaint."). These cases have not yet been explicitly overturned. However, that same language was previously utilized in the context of a Fed. R. Civ. P. 12(b)(6) motion to dismiss prior to *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In *Twombly*, the Supreme Court explained that this "no set of facts" language "earned its retirement" because it is simply "an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 563. As caselaw is clear that the standards are functionally identical for a Fed. R. Civ. P. 12(b)(6) and 12(c) motion, the Court will apply the *Twombly* standard. *See, e.g., Perez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 29 (1st Cir. 2008) (applying *Twombly* to a Fed. R. Civ. P. 12(c) motion); *Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 549-50 (6th Cir. 2008) (same); *Doe v. MySpace Inc.*, 528 F.3d at 418 (same); *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007) (same).

As a result, the Court must draw "all reasonable inferences in the [non-movant's] favor." *St. George v. Pinellas County.*, 285 F.3d 1334, 1337 (11th Cir. 2002). However, the Court is not required to accept a plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The U.S. Supreme Court has suggested that courts adopt a "two-pronged approach" when considering motions to dismiss: "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Am. Dental Ass'n v.*

*Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). Importantly, "courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Id.* (quoting *Iqbal*, 556 U.S. at 682).

## IV. DISCUSSION AND ANALYSIS

TimeTrex moves for judgment on the pleadings as to TruBridge's claims of breach of contract (Count 1) and trespass to chattels (Count 5).

### A. Breach of Contract

TimeTrex argues three (3) separate provisions of the Agreement are alleged to have been breached: an exclusivity clause, a confidentiality clause, and a support and maintenance rider. Doc. 39 at 1. TimeTrex argues the exclusivity clause of the Agreement, section 3.9, grants TruBridge an exclusive copyright-licensing right for "Products," which are defined in the Agreement, that it ordered from TimeTrex "under an Order Form," but TruBridge has not alleged TimeTrex granted a license to any of TruBridge's EHR solution customers. *Id.* at 3-4. TimeTrex argues, further, the exclusivity clause of the Agreement does not contain language of non-competition, non-solicitation, geographic restraint, or post-termination tail, but if read as a non-competition clause, as argued by TruBridge, it would be void under Alabama law as an unlawful restraint because the clause does not limit the parties' dealings with each other. *Id.* at 3-5. TimeTrex argues the claim that it disclosed confidential information to TruBridge's EHR/3R customers, in violation of the confidentiality clause of the Agreement, section 4.1, is not specific as to what information TimeTrex disclosed, and even if TruBridge's claim were properly alleged, TruBridge waived confidentiality for the Agreement when it filed in this matter, unsealed and unredacted, the Agreement. *Id.* at 5. TimeTrex argues TruBridge has not alleged a violation of

the support and maintenance rider, sections 2.3 and 3.4, because the Agreement specifies multiple types of support functions that are categorized into different tiers and may be provided by either TruBridge or TimeTrex and TruBridge failed to allege the type of support that TimeTrex provided as well as failed to identify any clause of the rider that the update on the human resources and payroll solution violated. *Id.* at 6-7. Finally, TimeTrex argues TruBridge has not alleged specific damages that it suffered as a result of TimeTrex's alleged breaches of the support and maintenance rider, which is subject to a limitation of liability provision in the Agreement that bars indirect damages, such as loss of reputation, a type of damages that TruBridge claims. *Id.* at 7-8.

In response, TruBridge first addresses the exclusivity clause of the Agreement. TruBridge argues the clause granted TruBridge exclusive licensing rights and TruBridge alleges TimeTrex told TruBridge's EHR customers, despite the termination of the relationship between TruBridge and TimeTrex, the customers' experience with TimeTrex's product would not be affected and they could continue to use the product as well as TimeTrex's support of the product. Doc. 42 at 5-7. TruBridge argues there is an issue of material fact as to what versions of the software that TimeTrex offered to TruBridge's EHR customers, with some of whom TruBridge alleges TimeTrex has entered into agreements, negotiated agreements, and sent proposals. *Id.* at 7. TruBridge argues the exclusivity clause of the Agreement is not void under Alabama law because it is effectively an exclusive distribution agreement and, even if it were a restraint on trade, it is reasonable in scope. *Id.* at 7-9. As to the confidentiality clause of the Agreement, TruBridge argues it alleges TimeTrex shared the terms and conditions of the Agreement when it told a TruBridge EHR customer TimeTrex was no longer prohibited from entering into an agreement with the customer. *Id.* at 9-10. TruBridge argues it did not waive the confidentiality clause of the Agreement when it filed the Agreement with its Verified Complaint because the information did

not become generally known to the public. *Id.* at 10-11. As to the support and maintenance rider of the Agreement, TruBridge argues TimeTrex's support that was provided to TruBridge's EHR customer was categorized in the Agreement as the types of support that TruBridge provided directly to its customers, which are described in the rider as noncomprehensive. *Id.* at 11-13. TruBridge argues the automatic update that TimeTrex transmitted to TruBridge's EHR customers was outside the scope of the type of support that the Agreement authorized TimeTrex to provide. *Id.* at 13. TruBridge argues it alleged direct damages because of TimeTrex's breach of the support and maintenance rider based on its allegations that it has lost and continues to lose revenue and the update caused client disruption with integrations and impaired hospitals' use of the EHR, and human resources and payroll, solution. *Id.*

"The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." *Shaffer v. Regions Fin. Corp.*, 29 So. 3d 872, 880 (Ala. 2009). "[T]he basic elements of a contract are an offer and an acceptance, consideration, and mutual assent to the essential terms of the agreement." *Sirote & Permutt, P.C. v. Caldwell*, 293 So. 3d 867, 873 (Ala. 2019) (citations omitted).

The Court will, now, address each clause of the Agreement by which TruBridge brings a breach-of-contract claim.

**1. Exclusivity**

The purported exclusivity clause of the Agreement reads:

> **3.9 <u>Exclusive Rights</u>** TimeTrex grants to CPSI exclusive licensing rights for hospitals, clinics and skilled nursing facilities that have purchased CPSI's EHR solution, excluding those that are both pre-existing and current customers of TimeTrex, its partners or resellers.

Doc. 1-1 at 3-4 (bold in original).

In the First Amended Complaint, TruBridge states "TimeTrex's actions identified in paragraphs 27 through 33 all represent a breach of [the exclusivity clause] of the Agreements." Doc. 14 at 8. Paragraphs twenty-seven (27) through thirty-three (33) read:

> 27. Shortly after TruBridge's customer announcement, TimeTrex began directly marketing its good and services to TruBridge's EHR and EHR/3R customers.
>
> 28. Initially, TimeTrex's marketing attempts were subtle but misleading. For example, TimeTrex told TruBridge's customers TimeTrex would continue to support hospitals outside of TruBridge's offerings, the termination of the relationship between TimeTrex and TruBridge would not impact their TimeTrex experience in any way, and they could continue to use the TimeTrex product as well as TimeTrex's support of the product.
>
> 29. As a result of TimeTrex's statements, counsel for TruBridge sent a cease-and-desist letter to TimeTrex on January 30, 2025, demanding that TimeTrex "immediately stop, and instruct its employees and representatives to stop, employing such deceptive and defamatory sales tactics and immediately cease and desist from any further and wrongful deceptive communications regarding TruBridge and CPSI." Doc. 1-3 at Page ID #51.
>
> 30. TimeTrex failed to comply with TruBridge's cease-and-desist demand.
>
> 31. Indeed, TimeTrex became more aggressive and less subtle and began directly asking customers to enter into agreements directly with TimeTrex. For example, on March 13, 2025, at 3:36 p.m., TimeTrex contacted a TruBridge EHR/3R customer and asked the customer to sign an agreement with TimeTrex. TimeTrex also told the customer that it was no longer prohibited from entering into an agreement with the customer, which was and continues to be categorically false.
>
> 32. Since then, TimeTrex has entered into agreements with TruBridge's EHR/3R customers, is negotiating agreements with others, and is sending proposals to still others.
>
> 33. TimeTrex continues to directly market the human resources and payroll solution to TruBridge's EHR/3R customers.

*Id.* at 6-7.

Accepting as true the material facts alleged in TruBridge's pleadings as well as viewing those material facts, which include the documents that were attached to the Complaint and First

Amended Complaint, in the light most favorable to TruBridge, the Court finds it has pled sufficient facts to support its claim for breach of contract based on the exclusivity clause of the Agreement. The Agreement does not define "exclusive licensing rights," but Black's Law Dictionary defines an "exclusive license" as "[a] license that gives the licensee the sole right to perform the licensed act, often in a defined territory, and that prohibits the licensor from performing the licensed act and from granting the right to anyone else; esp., such a license of a copyright, patent, or trademark right." *License*, BLACK'S LAW DICTIONARY (12th ed. 2024). In the Agreement, "Licenses" are defined as "the specific Products licensed to Client in any Order Form" and "Product" or "Products" are defined as "the specific versions, modules, other components of [TimeTrex's] Enterprise Edition, Corporation Edition, optional products identified in this Agreement and other software products provided by [TimeTrex] pursuant to this Agreement . . . that are described and ordered by [TruBridge] under an Order Form." Doc. 1-1 at 11-12. TruBridge alleges TimeTrex entered into agreements with certain of TruBridge's EHR/3R customers, the details of which are not specified but could include terms to distribute licenses for certain TimeTrex products; TimeTrex represented to TruBridge's customers their experience would not be impacted because TruBridge and TimeTrex's relationship would terminate, which indicates the product the customers would use would remain the same; and as part of the Agreement that was submitted with the First Amended Complaint, "Order Form 0001" shows "Annual Licenses purchased" was for a certain amount of "Guaranteed Employee Corporate Edition Licenses," which indicates the "Product" or "Products" that TimeTrex licensed to TruBridge. *Id.* at Doc. 1-1 at 32. Whether the product that TimeTrex licensed to TruBridge is the same product that TimeTrex entered into agreements with TruBridge's customers to potentially distribute is a matter that can be determined through the discovery process.

As to whether the exclusivity clause of the Agreement is void under Alabama law, the statute to which TimeTrex cites, Ala. Code § 8-1-190, does not apply to the purported exclusivity clause of the Agreement. The Alabama Supreme Court detailed the history and evolution of the statute, which applies to *employee* noncompete agreements:

> Section 8-1-190(a), Ala. Code 1975, provides: "Every contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind otherwise than is provided by this section is to that extent void." Section 8-1-190(b) then lists six categories of restrictive covenants that are "allowed to preserve a protectable interest." One of those categories is covenants in which "[a]n ... employee of a commercial entity . . . agree[s] with such entity to refrain from carrying on or engaging in a similar business within a specified geographic area so long as the commercial entity carries on a like business therein, subject to reasonable restraints of time and place." § 8-1-190(b)(4). However, § 8-1-192 provides: "In order to be valid, any contract or agreement executed pursuant to this article shall be reduced to writing, <u>signed by all parties</u>, and be supported by adequate consideration." (Emphasis added.)
>
> . . .
>
> Before noncompete agreements were governed by statute in this State, Alabama common law disfavored contracts in restraint of trade on the basis that they were generally against public policy. *See American Laundry Co. v. E. & W. Dry-Cleaning Co.*, 199 Ala. 154, 159, 74 So. 58, 60 (1917) ("Contracts in restraint of trade are in themselves, if not shown to be reasonable, bad in the eye of the law. [¶] Whatever restraint is larger than the necessary protection of the party with whom the contract is made is unnecessary and void, as being injurious to the interest of the public, on the ground of public policy."); *Smith v. Webb*, 176 Ala. 596, 600, 58 So. 913, 915 (1912) ("[T]he law does not look with favor upon restrictions against competition . . . ."). In 1923, the Legislature enacted Alabama's first statute regarding noncompete agreements. *See* § 6826, Ala. Code 1923; *Shelton v. Shelton*, 238 Ala. 489, 492, 192 So. 55, 57 (1939) (noting that § 6826 was "new to the Code of 1923"). That statute provided: "Every contract by which any one is restrained from exercising a lawful profession, trade, or business of any kind, otherwise than is provided by the next two sections, is to that extent, void." § 6826. The next two sections provided exceptions for sales of businesses and dissolutions of partnerships. §§ 6827-28. In 1931, the Legislature added an exception for employee noncompete agreements. Ala. Acts 1931, Act No. 647.
>
> Thereafter, the noncompete-agreement statutes remained substantively unchanged and were combined into one section in the 1975 Code. *See* Title 9, §§ 22-24, ALA. CODE 1940; former § 8-1-1, ALA. CODE 1975. Notably, the statutes carried forward the common law's disfavor toward noncompete agreements. *See Pitney Bowes, Inc.*

> *v. Berney Off. Sols.*, 823 So. 2d 659, 662 (Ala. 2001) ("In adopting § 8-1-1, the Legislature has declared the public policy of this state against noncompete agreements."); *Construction Materials, Ltd. v. Kirkpatrick Concrete, Inc.*, 631 So. 2d 1006, 1009 (Ala. 1994) ("Section 8-1-1 expresses the public policy of Alabama disfavoring contracts in restraint of trade . . . ."). Therefore, Alabama courts narrowly applied the statutory exception for employee noncompete agreements. *See Construction Materials*, 631 So. 2d at 1009 (holding that § 8-1-1's employee-noncompete-agreements exception did not apply, "in light of our public policy against restraints of lawful trade and our correspondingly strict construction of" the exception); *Pitney Bowes*, 823 So. 2d at 665-66 (Harwood, J., concurring specially) ("[W]e are dealing with 'fundamental public policy,' and we are therefore required to employ 'strict construction' in interpretating the 'agent, servant, or employee' exception contained in § 8-1-1(b) . . . ."); Michael Edwards et al., <u>The Enforceability of Covenants Not to Compete in Alabama</u>, 65 Ala. Law. 41, 42 (2004) ("Consistent with the [Alabama Supreme C]ourt's general attitude toward post-employment restraints, Alabama courts have narrowly construed the employer-employee exception contained in . . . § 8-1-1(b).").
>
> In 2015, the Legislature enacted §§ 8-1-190 through -197 to replace § 8-1-1 and to clarify the law regarding noncompete agreements. *See* Act No. 2015-465, Ala. Acts 2015; §§ 8-1-190 to -197 & Ala. cmts.; Will Hill Tankersley et al., <u>Alabama Enacts Major Revision of Alabama Code 8-1-1</u>, 76 Ala. Law. 384 (2015). This new statutory scheme continues to embody the common law's posture of disfavor toward contracts in restraint of trade. As noted above, the current statutes provide that such contracts are "void," subject to certain exceptions, including an exception for employee noncompete agreements. § 8-1-190. Accordingly, we continue to apply that exception narrowly in favor of competition, including the new requirement that the "contract or agreement" must be "signed by all parties," § 8-1-192.

*Amanda Howard Real Estate, LLC v. Lee*, 387 So. 3d 120 (Ala. 2023) (footnoted omitted).

The Alabama law that regulates employee noncompete agreements is inapplicable to the subject clause, which TimeTrex describes as an "exclusive copyright-licensing right." Doc. 39 at 3. Accordingly, TruBridge has sufficiently pled a claim of breach of contract based on the exclusivity clause of the Agreement, and TimeTrex's motion for judgment on the pleadings for said claim is **DENIED**.

**2. Confidentiality**

The purported confidentiality clause of the Agreement reads:

> **<u>4.1 Definition of Confidential Information.</u>** As used herein, "<u>Confidential</u>

> Information" means all Confidential Information disclosed by a Party ("Disclosing Party") to the other Party ("Receiving Party"), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure. Client's Confidential Information shall include Client Content; TIMETREX Confidential Information shall include the TIMETREX Technology, and Confidential Information of each Party shall include the Terms and Conditions of the Agreement and all Order Forms, as well as business and marketing plans, technology and technical information, product plans and designs, information disclosed during the course of TIMETREX provided maintenance and support, business processes and any other information that reasonably should be considered to be confidential that is disclosed by such Party. Confidential Information shall not include any information that: (i) is or becomes generally known to the public without breach of any obligation owed to the Disclosing Party, (ii) was known to the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation owed to the Disclosing Party, (iii) is received from a third-party without breach of any obligation owed to the Disclosing Party, or (iv) was independently developed by the Receiving Party.

Doc. 1-1 at 5 (bold in original).

In the First Amended Complaint, TruBridge alleges "[t]he terms and conditions of the Agreement constitute 'Confidential Information' under the Agreement and [the] Agreement prohibits the disclosure of 'Confidential Information.' . . . TimeTrex has shared the terms and conditions of the Agreement with TruBridge's EHR/3R customers." Doc. 14 at 8. TruBridge alleges "TimeTrex also told [a] customer that it was no longer prohibited from entering into an agreement with the customer, which was and continues to be categorically false." *Id.* at 7. Based on the relevant facts that are alleged in the First Amended Complaint, the Court finds TruBridge has sufficiently pled a claim of breach of contract based on the confidentiality clause of the Agreement.

As to whether TruBridge waived the confidentiality clause of the Agreement:

> Waiver is the intentional relinquishment of a known right. *O'Neal v. O'Neal*, 284 Ala. 661, 663, 227 So. 2d 430, 431 (1969). "[I]ntentional relinquishment must be shown in an unequivocal manner." *Putnam Constr. & Realty Co. v. Byrd*, 632 So. 2d 961, 965 (Ala. 1992). A party's intent to waive a right may be found from conduct that is inconsistent with the assertion of that right. *Givens v. Gen. Motors*

> *Acceptance Corp.*, 56 Ala. App. 561, 324 So. 2d 277, 279 (1975).
>
> . . .
>
> Whether a party has intentionally waived a known right is normally a jury question. *See Putnam Constr.*, 632 So. 2d at 965.

*Edwards v. Allied Home Mortg Cap. Corp.*, 962 So. 2d 194, 208-09 (Ala. 2007). The question of TruBridge's intent is not a subject that should be decided on a motion for judgment on the pleadings.

Accordingly, TimeTrex's motion for judgment on the pleadings for TruBridge's breach-of-contract claim that is based on the confidentiality clause of the Agreement is **DENIED**.

**3. Support and Maintenance Rider**

The purported support and maintenance rider states in relevant part:

> **2.1** TIMETREX has no obligation to provide Support Services other than as set forth in this Agreement and a mutually agreed Order Form.
>
> . . .
>
> **2.3** Support Services are provided to Client directly and are not provided to Client's customers or end-users. TIMETREX is not responsible for Tier 1 or Tier 2 support. TIMETREX will perform Tier 3 support services at no additional charge. TIMETREX is not responsible to provide any training to Client or Client's customers, except under an SOW.

*Id.* at 24 (bold in original).

In the First Amended Complaint, TruBridge alleges:

> 36. On March 24, 2025, TruBridge discovered that a TruBridge customer created a TimeTrex support login effectively deleting TruBridge's permission group. The TimeTrex support logic accessed TruBridge's customer account on March 24, at 4:19 p.m., from West Kelowna, BC, Canada. The use of this login by TimeTrex is a violation of the "Support and Maintenance Rider" of the Agreement, in particular, that "Support Services are provided to [TruBridge] directly and are not provided to [TruBridge's] customers or end-users" and "TimeTrex does not provide Support of any kind for [TruBridge's] end-users." [ ]
>
> 37. On May 13, 2025, TimeTrex forced an automatic and unauthorized

> update on the human resources and payroll solution and pushed a "pop-up" message through the human resources and payroll solution to remind TruBridge's EHR/3R customers about the "Rapid Migrate" service and telling customers that TimeTrex was "waiving all migration fees until June 30th" and providing contact information for customers if they had "any questions or would like to get started." [ ] This unauthorized update violated the Support and Maintenance Rider of the Agreement. TruBridge's EHR/3R customers continue to see notices related to the "Rapid Migrate" service every time they log into the system.
>
> 38. As a direct and proximate result of TimeTrex's breaches, TruBridge has lost and continues to lose revenue. Further, TruBridge pre-paid TimeTrex for access to and support for the human resources and payroll solution for customers during the tail period – customers that TimeTrex is now attempting to convert to its own. Finally, TruBridge has suffered a loss of reputation in the market and in the eyes of its customers.

Doc. 14 at 8.

"Support Services" are defined in the Agreement as "the specific maintenance and supports services described in the Support Rider and agreed to by the Parties in an accompanying Order Form." Doc. 1-1 at 12. The support and maintenance rider of the Agreement defines different types of support, "Tier 1 Support," "Tier 2 Support," and "Tier 3 Support." Doc. 1-1 at 23. "Tier 1 Support" is defined in the Agreement as:

> Support personnel assist end users by providing a general understanding of the software and solving basic end user issues. Support personnel gather information directly from users, analyze symptoms and determine the basic issue(s). Examples of issues that are generally resolved at Tier 1 include: enabling user access/security, guidance on how to use software features and functionality, menu navigation. Tier 1 issues are generally resolved without access to database tables, audit logs, diagnostic utilities, or source code. Tier 1 issues can usually be easily replicated and solved through the use of basic support tools or software documentation. When Tier 1 support personnel are unable to resolve an issue, it is escalated to Tier 2.

*Id.*

"Tier 2 Support" is defined in the Agreement as:

> Support personnel resolve more complex software issues that have been escalated and documented by Tier 1 support personnel. Examples of issues that are generally resolve at Tier 2 include: site preparation, initial installation, configuration settings, connection problems related to 3rd party products, database management,

> implementation of known solution to known issues. Resolving Tier 2 issues generally requires more technical expertise and more time to troubleshoot. Resolving Tier 2 issues may require access to intermediate-level data, logs and utilities. Tier 2 support activities do not include direct communication with end users. If Tier 2 support personnel determine that the issue is caused by a software Defect (i.e., the software is not working as designed) or that a higher level of system access is required to diagnose the issue, then the issue is escalated to Tier 3. Tier 2 support personnel are responsible for documenting Defects including steps to replicate the issue, expected system behavior, observed system behavior. When Tier 2 support personnel are unable to resolve an issue, it is escalated to Tier 3.

*Id.* And "Tier 3 Support" is defined in the Agreement as:

> Developing Product Defect fixes, including where highly privileged system access or access to the source code is required to resolve Tier 3 Incidents;
> - Modifying the Product source code as needed to address Defects;
> - Provide CPSI with upgrades, releases and patches that are provided to its other customers;
> - Provide patches for issues that are due to a software Defect; and
> - Verification of whether an incident is a Defect after it is already passed through Tier 1 and Tier 2 support and is documented as described in the definition of Tier 2 support.
> - In the event that an Incident gets escalated to Tier 3 that is later deemed to not be a Product Defect, TimeTrex has no obligation to fix the issues under Tier 2 support.

*Id.*

The Court finds TruBridge has plausibly alleged a claim for breach of contact based on the support and maintenance rider of the Agreement. The type of alleged support that TimeTrex provided can be determined during the discovery phase of this matter. Further, TruBridge has sufficiently alleged damages that are based on TimeTrex's alleged breach of the support and maintenance rider in the Agreement.

Accordingly, TimeTrex's motion for judgment on the pleadings for TruBridge's breach-of-contract claim that is based on the support and maintenance rider of the Agreement is **DENIED**.

**B. Trespass to Chattels**

As to TruBridge's trespass-to-chattels claim, TimeTrex argues TruBridge did not allege TimeTrex's alleged act, an unauthorized update, deprived it of the use of its chattel for a material

time or harmed its interest in the physical condition, quality, or value of its chattel. *Id.* at 8-9. TruBridge argues the alleged act only disrupted the TruBridge's clients' use of the EHR and the human resources and payroll solutions, which are injuries to a third-party. *Id.* at 8-9.

In response, TruBridge argues it has sufficiently alleged that its chattel was "impaired as to its condition, quality, or value" because it alleged TimeTrex made changes to the solutions software code that sent an unapproved message and forced an unauthorized automatic update and the update caused client disruption with integrations and impaired hospitals' use of the EHR, and human resources and payroll, solution. *Id.* at 13-16. TruBridge argues the harm to its system from TimeTrex's unauthorized contact with it has been held to constitute actual damage for purposes of a trespass-to-chattel claim. *Id.* at 15-16.

Alabama follows the Second Restatement of Torts definition of "trespass to chattel." *See Poff v. Hayes*, 763 So. 2d 234, 238 (Ala. 2000). "A trespass to a chattel may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." RESTATEMENT (SECOND) OF TORTS § 217 (AM. LAW INST. 1965). "[A] person who is in 'possession of a chattle' is one who has physical control of the chattel with the intent to exercise such control on his own behalf, or on behalf of another." RESTATEMENT (SECOND) OF TORTS § 216 (AM. LAW INST. 1965).

> One who commits a trespass to a chattel is subject to liability to the possessor of the chattel if, but only if,
>
> (a) he dispossesses the other of the chattel, or
>
> (b) the chattel is impaired as to its condition, quality, or value, or
>
> (c) the possessor is deprived of the use of the chattel for a substantial time, or
>
> (d) bodily harm is caused to the possessor, or harm is caused to some person or thing in which the possessor has a legally protected interest.

RESTATEMENT (SECOND) OF TORTS § 218 (AM. LAW INST. 1965). Chattel personal is defined as "[a] tangible good or an intangible right (such as a patent)." *Chattel*, BLACK'S LAW DICTIONARY (12th ed. 2024).

> An unprivileged use or other intermeddling with a chattel which results in actual impairment of its physical condition, quality or value to the possessor makes the actor liable for the loss thus caused. In the great majority of cases, the actor's intermeddling with the chattel impairs the value of it to the possessor, as distinguished from the mere affront to his dignity as possessor, only by some impairment of the physical condition of the chattel. There may, however, be situations in which the value to the owner of a particular type of chattel may be impaired by dealing with it in a manner that does not affect its physical condition. Thus, the use of a toothbrush by someone else may lead a person of ordinary sensibilities to regard the article as utterly incapable of further use by him, and the wearing of an intimate article of clothing may reasonably destroy its value in his eyes. In such a case, the intermeddling is actionable even though the physical condition of the chattel is not impaired.

RESTATEMENT (SEC) OF TORTS § 218 cmt. h (AM. LAW INST. 1965).

In the First Amended Complaint, TruBridge alleges:

> 78. TimeTrex accessed TruBridge's EHR, which is hosted in TruBridge's Google Cloud environment, to make changes in the backend of the software code to send unsolicited and unapproved advertising message to TruBridge's customers and force an automatic update. In doing so, TimeTrex intentionally used and/or intermeddled with TruBridge's chattel.
>
> 79. The unauthorized update and advertising messages led to client disruption with integrations and impaired hospitals' use of the EHR and human resources and payroll solution.

Doc. 14. at 18.

The Court finds TruBridge has plausibly alleged a claim for trespass to chattels since it alleged a possessory right to its EHR and TimeTrex intermeddled with the EHR, the level of impairment to which can be determined through discovery.

Accordingly, TimeTrex's motion for judgment on the pleadings for TruBridge's trespass-to-chattels claim is **DENIED**.

## V. CONCLUSION

Accordingly, TimeTrex's Motion for Partial Judgment on the Pleadings (Doc. 39) is **DENIED**.

**DONE** and **ORDERED** this the 29th day of September 2026.

s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE